UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DESHAWN ACKLIN,

   Plaintiff,

v.            Case No. 13-cv-13182
             Honorable Gershwin A. Drain

CITY OF INKSTER, *et al*.

    Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#51]

### I. INTRODUCTION

On July 24, 2013, Deshawn Acklin ("Acklin" or "Plaintiff") filed the instant Complaint, pursuant to Section 1983 of Title 42 of the United States Code ("Section 1983") and Michigan law. *See* Dkt. No. 1. In the Complaint, Acklin alleges that seven police officers, employed by the Police Department in the City of Inkster, used excessive force to execute an arrest without probable cause. *See id.* at 3-4. Initially, Acklin brought this action against the City of Inkster and the following seven police officers: William Melendez ("Melendez"), Shawn Adams ("Adams"), Jeffrey Czarnecki ("Czarnecki"), Allen Lash ("Lash"), Phillip Randazzo ("Randazzo"), Douglas Parson ("Parson"), and Daniel Schewe ("Schewe"). *See id.* at 1.

In the Complaint, Acklin asserts that the arresting officers violated his federal constitutional rights, as secured by the Fourth Amendment of the United States Constitution, by subjecting him to an unconstitutional search and seizure. *See id.* at 3-4. Acklin asserts the officers acted in the scope of their employment in both their individual and official capacities.

*See id.* at 2.  Additionally, Acklin asserts the City of Inkster has a custom and policy of falsely arresting citizens, and acted with deliberate indifference by failing to adequately train, supervise, and review the officers' conduct. *See id.* at 6-7.

On July 25, 2014, Acklin filed a separate Complaint against Jordan Dotter ("Dotter"), an auxiliary police officer for the Inkster Police Department. *See Deshawn Acklin v. Jordan Dotter*, No. 2:14-cv-12922.  The Court consolidated the case against Dotter with the present action; adding Dotter as a Defendant with the other Defendants in the present action. *See* Dkt. No. 41.

Presently before the Court is Defendants' Motion for Summary Judgment. *See* Dkt. No. 51.  The matter is fully briefed, and, after reviewing the briefs of the parties, the Court concludes that oral argument will not aid in the resolution of this matter. Accordingly, the Court will resolve the Defendants' Motion on the briefs submitted. *See* E.D. Mich. L.R. 7.1(f)(2). For the reasons discussed herein, the Court will **GRANT** in part and **DENY** in part Defendants' Motion for Summary Judgment [#51].

## II. FACTUAL BACKGROUND

DeShawn Acklin was arrested by police officers from the City of Inkster Police Department on July 26, 2011.  After reviewing the briefing on this matter, the details of Acklin's arrest are in dispute. Mr. Acklin's recollection of the arrest differs markedly from the events recounted by the Defendants. However, even the Defendants' recitations of the arrest contain subtle inconsistencies that this Court cannot ignore.  In light of the differences between Acklin's version of events, and subtle inconsistencies in the Officers accounts, the Court will provide a summary of the multiple accounts explaining what occurred on July 26, 2011.

### A.  Acklin's Account

Acklin states he was "just hanging out" and driving his mother's black 2000 Crown Victoria when he picked up his friend Anthony Freeman ("Freeman") around 10:00 a.m. on July 26, 2011.  After picking up Freeman, Acklin states that he and Freeman "cruised around" until 4:00 p.m. listening to music.

After "cruising around," Acklin recalls picking up four of Freeman's female friends and taking them to Josh Levye's (Levye) house, located at 3574 Isabelle Street in the City of Inkster. Upon arriving at Levye's house, Acklin recalls "hanging out on [Levye's] porch" with Levye, Freeman, and the four females. To his knowledge, Acklin does not recall anyone possessing weapons or drugs.  Acklin specifically asserts that he did not have any weapons or drugs on his person.  Acklin does recall having "a fifth of Vodka, but it was unopen." Acklin asserts that he and his friends "didn't get to drink [and] we didn't get to smoke."

Around  8:00  p.m.,  Acklin  recalls  going  inside  Levye's  house  to  use  the  bathroom. Acklin is adamant that only he went into the house at this point.  He asserts that he was only in the house for a matter of minutes before the police arrived at the home. When Acklin emerged from the bathroom, he asserts that Freeman had entered the house and that there was "a lot of beating on the door," which Acklin assumed to be the police.

Acklin asserts that he sat in the middle of the house while the police were knocking on the door and did not open the door because it was not his house. Acklin then asserts the police kicked in the side door of the house, came through the kitchen, and turned the corner to encounter him and Freeman.  Acklin asserts that he didn't really know any of the officers, but did seem to imply that he knew Defendant Randazzo, who was wearing plainclothes.

According to Acklin, Randazzo's partner fist made contact and directed Acklin to freeze, and Acklin complied. Acklin remembers Randazzo's partner wearing plainclothes and describes

him as a muscular white man with a build similar to "the Rock."  After he froze, Acklin says that Randazzo's partner directed him to come to him, and Acklin complied. Acklin states that the officers directed Freeman to get on the ground, whereupon Freeman was handcuffed.

Similarly, Acklin claims that the officers instructed him to get down. Acklin asserts that he complied and put his hands behind his back.  Acklin states he was handcuffed halfway on the floor and halfway on top of a mattress in the living room. Upon being handcuffed, Acklin asserts he was punched in the face, a knee was placed into his back, and he was assaulted by Randazzo and Randazzo's partner. According to Acklin, he was choked, punched, and beaten until he defecated on himself and went unconscious. Acklin states that the officers were yelling for him to stop resisting, though Acklin insists he was not resisting.  Acklin does not recall much about the assault.  He does, however, remember an officer dressed in uniform stopping the assault by tapping Randazzo's partner on the shoulder and saying "that's enough."

Acklin remembers getting picked up and everyone having "a shocked face expression[.]" He asserts he was kept in handcuffs and escorted directly to the hospital in a squad car by "the same officers who jumped on [him.]"  On the way to the hospital, Acklin claims he asked why he was being arrested. According to Acklin, Defendant Randazzo replied that the officers were looking for a suspect in the neighborhood, and Acklin fit the suspect's description.

At the hospital, Acklin asserts that Randazzo's partner taunted him by asking whether Acklin liked the "wrestling moves when he choked [him]." After leaving the hospital Acklin was taken to jail, where he waited for three days. He was able to change out of his soiled clothing within a few hours of sitting in jail.  Upon being told that drugs were found on Levye and two guns were found in the house, Acklin states he was surprised.  He stated that Freeman wrongly

accused him of owning one of the two guns that was found in the bedroom of the house. Acklin asserts he never entered any bedroom inside the house at any time.

In sum, Acklin maintains that he never saw police officers arrive outside of the house because he was inside. Acklin claims he never ran from the police at any time, never resisted arrest, never attempted to fight the police, never had a gun, never reached into his waistband, never possessed drugs, and never yelled or spit at the police.  Following his arrest, Acklin claims he never went to court, was never charged as a result of the incident, and was released after three days out through the back door of the jail.

**B. Defendant Melendez's Account**

Defendant Melendez claims he was working in an undercover capacity on July 26, 2011, when checking the area around Isabelle for a black male wanted for a shooting.  Melendez asserts the police were looking for an individual named "Johny" with a tattoo of a gun on his neck and the phrase "Fuck the world" on his forehead.  The officers' investigation led them to conclude that the suspect frequented the area of Isabelle.

According to Melendez, the area of Isabelle was known as a narcotic location.  Because of Isabelle's reputation, Melendez claims Defendant Randazzo decided to use the undercover vehicle to conduct surveillance in the area to search for the suspect.  Melendez states that he and Randazzo drove southbound past 3574 Isabelle Street in Inkster around 1:54 a.m., with the house on his right-hand side.  Notably, Melendez says there were several "runs" to 3574 Isabelle Street for shots fired from the side of the house.

When driving past the location, Melendez states that he saw three males and two or three females conversing in front of a dark colored Ford that was parked in the driveway of the house. Melendez notes that the undercover vehicle had tinted windows, and that he and Defendant Randazzo passed by the house slowly.  The individuals outside of the house purportedly looked

-5-

at the vehicle and stopped their conversation.  Given the officers' investigation, and because Isabelle was a high crime area and loud music playing, Melendez indicated that the situation warranted an investigation.

According to Melendez, Randazzo passed by the house, drove down the street, and "immediately" got on the radio to request back up.  Randazzo advised the backup of the location, and coordinated the scout cars and how they would approach the house in position.  Melendez and Randazzo then drove back to the house and their undercover vehicle was the first in position.

Upon arriving at the location, Melendez indicates that he exited the passenger side of the vehicle, identified himself as a police officer, and flashed a light on the situation to "get a clear view." Contrary to Acklin's assertions, Melendez asserts that Acklin, Freeman, and Levye were present with the females when the police arrived at the house.  Melendez states that Levye was in the middle of the vehicle, while Acklin and Freeman were standing on the right of Levye.

As soon as Melendez identified himself as a police officer, he states that he observed Acklin and Freeman "immediately reach to the front side of their waistband reach up under their shirt and grab an object." Melendez states that he drew his weapon, whereupon Acklin and Freeman ran to the side of the residence while holding objects in their respective waistbands. Melendez states that Randazzo detained Levye for officer safety. Then, in approximately less than a minute, Melendez asserts that Defendants Randazzo, Schewe, Czarnecki and Lash went to the side of the house.  Melendez indicates that he could hear voices in the kitchen area, so he knocked, announced, and then kicked in the door.

Upon entry, Melendez describes himself as the "point man" with Randazzo second behind him.  Melendez could *not* recall who was after that. Upon kicking in the door, Melendez claims he immediately went to the kitchen area and saw Acklin, who Melendez states

"immediately, with his right hand, reached up underneath his T-shirt into his waistband and removed a black in color handgun." Melendez asserts Acklin—handgun in hand—then turned towards the living room and made a right turn down a hallway.  Melendez indicates that he and Randazzo cleared the kitchen area and that Randazzo then held him from making entry past the living room in order to give the suspects an opportunity to surrender.

According to Melendez, Randazzo ordered the suspects out with their hands up. Melendez indicates that Freeman exited out of the bedroom with his hands out in a compliant manner and followed Randazzo's instructions.  Freeman was secured, placed in restraints, and then passed along to supporting officers.

Melendez asserts that Acklin exited the back bedroom with no handgun and with both of his hands "in the middle of his chest area up." Melendez asserts that Acklin was not compliant with Randazzo's instructions and walked towards the officers with a "quicken[ed] pace" and a "threatening demeanor." No words were purportedly exchanged, but, as Melendez moved to place restraints on Acklin, Melendez asserts that Acklin "with his right hand then came forward with a closed fist and attempted to – did swing at me towards my left facial area."

In defense, Melendez states that he struck Acklin with his right fist once in each eye, rendering Acklin unconscious for a brief period.  Melendez states that he held on to Acklin so he would have a "controlled fall."  When Acklin went down on his back, Melendez states he rolled him over onto his stomach to place restraints on him. Melendez states that he believes Defendant Lash and Schewe were in the interior at this point.

Upon rolling Acklin on his stomach, Defendant Melendez claims Acklin "came to," and a struggle ensued with Acklin kicking, flailing his arms, and attempting to roll over. Melendez states that he attempted to place Acklin in an arm-lock position. After a struggle over "a period

of minutes" Melendez states that Acklin finally complied and he was able to get handcuffs on him. Melendez does not recall receiving assistance from any other officers, and states he never chocked, kicked, or delivered knee strikes to Acklin.

After cuffing Acklin, Melendez noted abrasions to Acklin's left and right eye and the smell of defecation. Acklin was then escorted to the scout car, and Melendez indicates he was advised Acklin started spitting blood at officers and was maced. Melendez states that he later took Acklin "straight to the hospital" with Randazzo. At the hospital, Defendant Melendez states that Acklin apologized for his behavior and that Acklin was able to clean himself at the hospital.

Acklin was purportedly booked after leaving the hospital. Melendez denies anyone ever telling him "that's enough" when arresting Mr. Acklin. Melendez denies ever asking Acklin whether Acklin liked his wrestling moves. At the station, Melendez indicates that police pictures were taken and reports were filed. When completing reports, however, Melendez was unable to locate an injured prisoner report or use of force form. Nonetheless, Melendez believes he filled out a use of force or injured prisoner report. Neither a use of force report nor an injured prisoner report was found. The police report does mention that force was used, and Melendez suggested which charges should be brought.

### C.  Defendant Randazzo's Account

Defendant Randazzo's account matches Defendant Melendez's account, but there are some subtle and important differences. Defendant Randazzo indicates that he made contact with Levye "right away," which then led to Acklin and Freeman grabbing their waistbands and running into the house. Randazzo also asserts he yelled for the other officers to be advised that Acklin and Freeman were armed with guns after he saw them flee. Randazzo states he recovered a bag of heroin from Levye and placed him in the back of the squad car.

-8-

Randazzo claims he joined Melendez at the side door of the house and advised Defendant Czarnecki that he and Melendez were in hot pursuit and entering the house. Randazzo states that Czarnecki was on the scene, but not at the house. Randazzo recalls Defendant Lash being present for the entry into the residence, but could not recall any other officer being present. Unlike Melendez, Randazzo did not recall hearing anything within the house prior to entry.

After entering the residence, Randazzo indicates that he scanned the kitchen for safety. Notably, Randazzo does not indicate that he saw Acklin in the kitchen. Critically, Randazzo makes no mention of Acklin drawing a weapon. After scanning the kitchen, Randazzo indicated that Melendez attempted to take off through the house, but that he told Melendez to wait and let the suspects come to them for officer safety.

Randazzo states that Freeman walked out first with his hands up. Randazzo states that he then passed Freeman to Melendez to be secured. At this point, Randazzo states he saw Acklin, for the first time, as Acklin walked out with his hands chest level and palms forward. Randazzo asserts that Acklin lowered his hands and walked quickly towards Defendant Randazzo and Melendez. Randazzo says he guided Acklin towards Melendez, and once Acklin was "out of [his] peripheral" he heard "Officer Melendez and Mr. Acklin start fighting."

According to Randazzo, he heard "Melendez going get on the ground, get on the ground." As Randazzo looked over, he says he saw Acklin falling down. Randazzo states Acklin was not guided during the fall. While Randazzo indicates Acklin was not verbally complying, Randazzo does not note any physical resistance on behalf of Acklin at that point.

Randazzo explained that Melendez got on Acklin to control him after the fall, and Melendez rolled Acklin over to Acklin's stomach. While Acklin was being rolled over, Randazzo claims Acklin began kicking, flailing his arms, and trying to actively resist or get away

from Melendez.  Randazzo did not recall seeing Acklin kick or hit any officer. However, because Acklin continued to struggle, Randazzo indicates he gave Acklin "two or three" knee strikes and applied pressure to Acklin's pressure points in order to create "pain compliance."

After applying pressure to a pressure point behind Acklin's ear, Randazzo notes that Acklin complied. Randazzo only recalls Melendez and himself using force.  Randazzo does not recall other officers using force and does not recall any other officers being in the living room. At no point does Randazzo recall anyone choking Acklin. Randazzo believes Acklin was cuffed and passed onto auxiliary officers. He also was made aware that Acklin purportedly spit on the auxiliary officers, and that the officers maced Acklin.

While Melendez states that Acklin was placed in a squad car and taken directly to a hospital, Randazzo recalls meeting Acklin at the hospital after Acklin was transported by an ambulance. Randazzo states Acklin was booked by auxiliary officers and placed in a cell, but does not know how Acklin was released.

### D.  Defendant Lash's Account

There are also some subtle differences in the account given by Defendant Lash.  Lash states he was advised that the subjects were armed, and responded to the scene in two minutes. As he arrived to the scene, Lash recalls encountering Defendant Randazzo securing a subject by a vehicle. By the time Lash arrived Acklin was already in the house.

According to Lash, Defendant Schewe arrived at the same time Lash arrived. Lash states that he followed Randazzo and Melendez to the side door and made entry after Melendez breached the door.   Prior to entry, Lash did not recall hearing anything within the residence. Lash states that he entered the house and covered the long hallway.

Once inside, Lash states he saw no one. He does claim he saw Acklin when he emerged, but never saw Acklin with a weapon. According to Lash, Acklin was not following the verbal

commands of Randazzo and Melendez. Lash also states that Freeman exited the room after Acklin, and that Freeman was compliant when he was cuffed and then handed over to an Officer Duvall who took Freeman outside.

During this period, Lash states that Melendez continued to struggle with Acklin and that Acklin was going chest to chest with Melendez.  According to Lash, Acklin was actively resisting, kicking, and throwing his arms. Lash could not tell if Acklin was throwing punches. Lash states Randazzo searched the rest of the house then came back and helped Melendez place cuffs on Acklin. Notably, Lash indicates that he laid his shin across Acklin's legs to keep Acklin's legs down while Acklin was cuffed.  As Acklin was cuffed, Defendant Lash remembers Defendant Czarnecki being present while Acklin was escorted outside. Lash also remembers hearing about Acklin spitting at officers.

### E.  Defendant Czarnecki's Account

Defendant Czarnecki's testimony differs because he indicates that he only entered the residence after Acklin was placed into custody. Czarnecki remembers Acklin being placed in an Inkster squad car.  Czarnecki does not recall Acklin spitting blood at anybody. He also does not recall Acklin being maced. Czarnecki indicated that the use of force form was supposed to be completed at the time of the report. He also noted that the office regularly ran out of the forms.

### F.  Defendant Schewe's Account

Defendant Schewe's account is the first to mention the presence of Schewe's K-9 partner, "Xander."  Schewe indicates that he pulled up to the scene directly behind Defendants Randazzo and Melendez.  Schewe recalls seeing individuals run upon arrival. Schewe saw one individual holding his waistband and he recalls Randazzo "broke off and ran towards the front of the house."  Schewe believed Randazzo was chasing someone.

At that point, Schewe remembers himself and his K-9 partner accompanying Melendez and another officer to the door on the side of the residence in order to breach the house. Notably, Schewe does not place Randazzo at the initial breach of the residence. Schewe also remembers no noises coming from within the residence.

Schewe recalls the breach and Melendez entering the house first. However, Schewe states he did not go past the first room they entered because other officers entered while Schewe secured the door with his K-9 partner. Schewe never recalls hearing a verbal indication that anyone in the house was armed. Schewe's recollection is very sparse from that point.

According to Schewe, he could not see what was going on and only remembers a lot of commotion and scuffling in the house.  Schewe remembers being focused on securing the door and his dog barking from all the excitement. After the scene was secure, Schewe and his K-9 conducted a search, whereupon Shewe's K-9 partner uncovered two loaded handguns and a cell phone in the southwest bedroom.

**G.  Defendant Adams' Account**

When Defendant Adams arrived, Mr. Acklin was already arrested. However, Adams account differs because he recalls Acklin leaving the scene and going to the police station first. Upon seeing Acklin's physical state, Adams had officers call the hospital so Acklin could receive medical attention. Adams does not know if the officers took Acklin to the hospital. Adams does, however, indicate that Acklin came to the station first. Notably, this is contrary to the testimony of other officers who have indicated Acklin went directly to the hospital.

**H.  Defendant Dotter's Account**

Defendant Dotter was an auxiliary police officer and served in an unpaid position on a volunteer basis. Dotter indicates that he only had full police power when acting at the direction of police officers.  In order to become an auxiliary Dotter had to apply for the position and meet

-12-

once a week on Saturdays for twenty weeks. Dotter indicates that he arrived as the other Defendant officers were about to breach the residence. Dotter states that his job was to secure the perimeter and make sure no one else exited or moved towards the residence.

When Acklin was brought out of the residence, Dotter was present. Dotter claims he attempted to conduct a custodial search of Acklin, but Acklin was being aggressive and spitting on the car.   According to Dotter, Acklin squirmed around and pushed off the vehicle in an attempt to resist arrest. Dotter asserts he needed assistance because Acklin was knocking him off balance.

After Securing Acklin in the vehicle, Dotter asserts that he transported Acklin to the police station with an Officer Anderson. At the station Dotter maced Acklin while Acklin was handcuffed and restrained behind a protective black barrier in the police vehicle.  According to Dotter, he gave Acklin a warning that mace would be used if Acklin did not stop spitting. Dotter states that the mace never made contact with Acklin's face, but he notes that Acklin immediately started coughing. As a result, Acklin was subsequently transported to the hospital.  Dotter claims he informed Defendant Czarnecki about the use of mace.

### I.   Medical Records

Acklin's Medical Records from Garden City Hospital indicate that Acklin arrived at 2:53 a.m. on the morning of July 26, 2011. The records indicate that Acklin was transported by an ambulance from the Inkster Fire Department.  The records indicate Acklin arrived handcuffed in police custody with a contusion above his left and right eye. Specifically, Acklin had swollen eyes, bilateral hematomas, and lacerations over the eyelids.

### III. LAW AND ANALYSIS

#### A.  LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) empowers the court to render summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

## B.  LEGAL ANALYSIS

Acklin brings this case pursuant to Section 1983 and Michigan law. Given the layered nature of the claims, the Court will discuss the liability for the Defendants in three parts. First, the Court will analyze the Section 1983 liability for the Defendant Officers. Next, the Court will address the Section 1983 Municipal Liability for the City of Inkster. Lastly, the Court will discuss the liability for the Defendant Officers pursuant to Michigan law.

### 1.   Section 1983 Liability for the Defendant Officers

By its terms, Section 1983 is limited as it does not itself create or establish any federally protected rights. *See* 42 U.S.C. § 1983.  Instead, Section 1983 creates a cause of action for plaintiffs to enforce federal rights established elsewhere—be it the federal Constitution or, in some cases, other federal statutes. *Graham v. Connor*, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (U.S. 1989); *Gardenhire v. Schubert*, 205 F.3d 303, 310 (6th Cir. 2000).

A plaintiff may not avoid the limitations of Section 1983 by simply asserting a claim directly under the Constitution. *See Jet v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989).

To properly set forth and prevail on his Section 1983 claims, Acklin "must establish that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States." *Waters v. City of Morristown,* 242 F.3d 353, 358–59 (6th Cir. 2001); *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988).

The Supreme Court has stated that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Green v. Reeves,* 80 F.3d 1101, 1104 (6th Cir. 1996).

In *Saucier v. Katz*, the Supreme Court put forth a mandatory two-part sequential inquiry to determine whether officials were entitled to qualified immunity. 533 U.S. 194, 200-01, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).  In *Pearson v. Callahan,* the Supreme Court revisited the requirement that the two-part inquiry be performed sequentially.  555 U.S. 223, 236-37, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). In *Pearson*, the Supreme Court determined that the "*Saucier* protocol [would] not be regarded as mandatory in all cases," but the Court decided it would "continue to recognize that it is often beneficial." *Pearson*, 555 U.S. at 236.

Because the Supreme Court continues to regard the *Saucier* two-part inquiry as beneficial, some Courts in this District continue to apply the *Saucier* test. *See*, *e.g.*, *Jackson v. Cnty. of Washtenaw*, No. 12-10963, 2015 WL 630619, at *2 (E.D. Mich. Feb. 12, 2015); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) (noting "Courts have discretion to decide the order in which to engage these two prongs.").

Nevertheless, this Court will use the following tri-part test, put forth by the Sixth Circuit, to determine whether a defendant is entitled to qualified immunity:

-16-

(i)     [W]hether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred;

(ii)    whether the violation involved a clearly established constitutional right of which a reasonable person would have known; and

(iii)   whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (quoting *Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir. 2003)); *see also Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (noting that "objective legal reasonableness" is a distinct, third prong of the qualified immunity analysis); *Black v. Michigan Dep't of Corr.*, No. 14-11038, 2015 WL 668142, at *4 (E.D. Mich. Feb. 17, 2015) (applying this approach in this District). This Court is not required to address these inquiries sequentially; instead the Court may use its sound discretion to determine which prongs should be considered first. *Pearson,* 555 U.S. at 236.

Material facts are disputed in many Section 1983 cases and this case is no different. Summary judgment must be granted if a plaintiff cannot establish each of the three elements for qualified immunity. *Radvansky*, 395 F.3d at 302 (citing *Williams ex rel. Allen v. Cambridge Bd. of Educ.,* 370 F.3d 630, 636 (6th Cir. 2004)). Furthermore, summary judgment may be granted for the defendant official if, interpreting the facts in the light most favorable to the plaintiff, the Court determines the facts do not state a violation of clearly established federal law. *Anderson v. Creighton*, 483 U.S. 635, 646 n.6, 107 S. Ct. 3034, 3042 n.6, 97 L. Ed. 2d 523 (1987).

However, the Supreme Court has stressed that, on a defendant official's summary judgment qualified immunity motion, federal courts may not resolve genuine issues of disputed fact in favor of the defendant.  Instead, the Court must view the facts in the light most favorable to the non-moving party. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1865-68, 188 L. Ed. 2d 895

-17-

(2014). *But see Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).

### a.   Analysis of Fourth Amendment Excessive Force Claims

Here, the Defendants assert that all of the officers are entitled to qualified immunity with respect to Acklin's claims of excessive force. *See* Dkt. No. 51 at 2.  Specifically, the Defendants contend they should be entitled to qualified immunity because they contend they did not violate any statutory or constitutional right that was clearly established and of which a reasonable person should have known. *See id.* (citing *Harlow*, 457 U.S. at 819).

Acklin contends that Defendants Melendez, Randazzo, Dotter, and Lash should not be entitled to a qualified immunity because "[t]he use of force on an individual who is handcuffed is by its very nature excessive." *See* Dkt. No. 53 at 22 (citing *Merithew v. Amore*, 417 F. App'x 494 (6th Cir. 2011)). As for Defendants Czarnecki, Schewe, Adams, and Parson; Acklin contends these officers should be held liable for failing to intervene. *See id.* at 25 (citing *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982).

For the reasons that follow, the Court finds Defendants Melendez, Randazzo, Dotter, and Lash, are not entitled to qualified immunity with respect to Acklin's claims for excessive force. With respect to Defendants Parson, Adams, Czarnecki, and Schewe, however, the Court finds these Defendants are entitled to the qualified immunity defense in light of the facts presented.

### i.   Qualified Immunity Analysis for Defendants Melendez, Randazzo, and Dotter

The Court finds Defendants Melendez, Randazzo, and Dotter are not entitled to qualified immunity because they purportedly used force against Acklin while he was handcuffed and not resisting arrest.  In *Merithew v. Amore*, the Sixth Circuit indicated that it's "prior opinions clearly establish that it is unreasonable to use significant force on a restrained subject, even if some level

of passive resistance is presented." 417 F. App'x 494, 499 (6th Cir. 2011) (citing *Griffith v. Coburn,* 473 F.3d 650, 659 (6th Cir. 2007); *Shreve v. Jessamine Cnty. Fiscal Court,* 453 F.3d 681, 687 (6th Cir. 2006); *Smoak v. Hall,* 460 F.3d 768, 783-84 (6th Cir. 2006)). When applying the Sixth Circuit's three-part test for the entitlement to qualified immunity, the Court finds that Melendez, Randazzo, nor Dotter satisfy the test.

With respect to Defendant Melendez, the Sixth Circuit has specifically noted that "'there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others.'" *Merithew*, 417 F. App'x at 499 (quoting *Harris v. City of Circleville,* 583 F.3d 356, 367 (6th Cir. 2009)); *see also Phelps v. Coy,* 286 F.3d 295, 302 (6th Cir. 2002) (holding that a police officer's tackling of a handcuffed suspect, hitting him in the face twice, and banging his head on the floor three times, was unconstitutional), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 866, 154 L.Ed.2d 772 (2003).

Looking at the applicable law, and viewing the facts in the light most favorable to the Plaintiff, the facts demonstrate that a constitutional violation has occurred.  Though Acklin's account is disputed, Acklin asserts that he was lying handcuffed on the floor in a compliant manner before he was "senselessly beat, kicked, and choked [] to the point of unconsciousness." Dkt. No. 53 at 11; *see also* Dkt. No. 53-2 at 20-22.

Acklin has provided the Court with photographs depicting serious injuries to his head and face. *See* Dkt. No. 53-13. These images—coupled with Acklin's medical records indicating he arrived to the hospital with swollen eyes, bilateral hematomas, and lacerations over the eyelids—constitute sufficient evidence indicating that Melendez's purported actions were objectively unreasonable in light of Acklin's clearly established constitutional rights.

-19-

Defendant Randazzo also fails to satisfy the Sixth Circuit's three-part test for entitlement to qualified immunity. In the Sixth Circuit, it is clearly established that—after a suspect has been incapacitated—putting exceptional pressure on a suspect's back while the suspect is in a face-down prone position constitutes excessive force. *See Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 904 (6th Cir. 2004).

Randazzo has indicated that he delivered knee strikes and used pressure points to inflict pain on Acklin. *See* Dkt. No. 53-3 at 9. While Randazzo states that his actions were to induce compliance, Acklin adamantly asserts that he was handcuffed and compliant while Randazzo used force. *See*, *e.g.*, Dkt. No. 53-2 at 21. Applying the applicable law in the light most favorable to Acklin, the facts as presented demonstrate a constitutional violation.

Moreover, Acklin has provided the Court with images of the bruises on his back following his encounter with the Defendants. *See* Dkt. No. 53-13. Again, these images, coupled with Acklin's medical records, constitute sufficient evidence indicating that Randazzo's purported actions were objectively unreasonable in light of Acklin's clearly established constitutional rights.

Lastly, the Court finds that Defendant Dotter fails to satisfy the Sixth Circuit's three-part test for entitlement to qualified immunity. Sixth Circuit precedent dating back to 1994 indicates that the use of mace can amount to excessive force if used unreasonably against a non-resisting suspect. *See Schmalfeldt v. Roe,* 412 Fed. Appx. 826, 828 (6th Cir. Feb.23, 2011) (citing *Adams v. Metiva,* 31 F.3d 375, 387 (6th Cir. 1994)).

Here, Dotter does not deny using mace on Acklin while Acklin was handcuffed and restrained behind a protective black barrier of a police vehicle. *See* Dkt. No. 53-5 at 7-8. Instead, Dotter asserts that the use of mace was justified out of concerns for his safety. The Court is not

persuaded by the Defendants' attempt to imply that Dotter was required to spray Acklin out of fear of contracting HIV as a result of Acklin purportedly spitting blood.

As an initial matter, Acklin indicates he was compliant at all times with the officers. Thus, because the Court must construe the facts in the light most favorable to Acklin, there is a genuine issue of material fact whether Dotter's actions were objectively reasonable given Acklin's clearly established constitutional rights.

Nevertheless, even if Acklin were spitting blood, the Court is troubled by the Defendants' contention that Acklin "plainly presented a clear threat of danger to the officers" because "by spitting blood, Plaintiff could have been exposing the officers to bloodborne diseases such as HIV." Dkt. No. 51 at 34 (citing *Bultema v. Benzie Cnty.*, 146 F. App'x 28, 36 (6th Cir. 2005) in an attempt to distinguish the facts of this case from the Sixth Circuit's finding that pepper spraying a plaintiff was excessive because "he could barely stand upright and was clearly not a threat to anyone's safety" even though the plaintiff "continued to struggle and squirm while handcuffed[.]""). The Court is hesitant to accept the Defendants' theory because it would promote an unfortunate stereotype that Acklin's spitting of blood presented a threat of Dotter contracting HIV.[1]

---

[1] The Centers for Disease Control (CDC) has created a website to raise awareness about HIV, in light of the fact that "[m]yths persist about how HIV is transmitted." Division of HIV/AIDS Prevention et al., *HIV Transmission*, CTR. FOR DISEASE CONTROL AND PREVENTION, http://www.cdc.gov/hiv/basics/transmission.html (last updated Jan. 16, 2015). According to the CDC, HIV can be passed from one person to another as follows:

> Only certain fluids—blood, semen (*cum*), pre-seminal fluid (*pre-cum*), rectal fluids, vaginal fluids, and breast milk—from an HIV-infected person can transmit HIV. These fluids must come in contact with a mucous membrane or damaged tissue or be directly injected into the bloodstream (from a needle or syringe) for transmission to possibly occur. Mucous membranes can be found inside the rectum, the vagina, the opening of the penis, and the mouth. . . . Less commonly, HIV may be spread by . . . [c]ontact between broken skin, wounds, or mucous membranes and HIV-infected blood or blood-contaminated body fluids. These reports [are] extremely rare. [HIV may also be spread by d]eep, open-mouth kissing if the person with HIV has sores or bleeding gums and blood is exchanged. HIV is not spread through saliva. Transmission through kissing alone is extremely rare.

In sum, while the Defendants present strikingly different version of facts, it is not the Court's role at this juncture to make credibility determinations regarding Acklin's testimony. *See*, *e.g.*, *United States v. Evans,* 883 F.2d 496, 501 (6th Cir. 1989) ("[i]ssues of witness credibility . . . are strictly for the jury to determine"); *Boutros v. Canton Reg'l Transit Auth.*, 997 F.2d 198, 202 (6th Cir. 1993) ("All credibility questions must be considered most favorably to the nonmoving party, and their resolution left to the jury."). The Court must apply the facts in the light most favorable to the non-moving party.  In applying the Sixth Circuit's three-part test to determine whether defendants are entitled to qualified immunity, the Court finds that Defendants Melendez, Randazzo, and Dotter do not satisfy the test.

### ii.    Qualified Immunity Analysis for Defendant Lash

The Court finds that Defendant Lash is entitled to qualified immunity for his use of force while Acklin was handcuffed.  However, the Court finds that Defendant Lash is not entitled to qualified immunity for failing to intervene while Defendants Melendez and Randazzo used force against Acklin.

As discussed, the Sixth Circuit's "prior opinions clearly establish that it is unreasonable to use *significant* force on a restrained subject, even if some level of passive resistance is presented." *Merithew*, 417 F. App'x at 499 (citations omitted) (emphasis added).  Here, Lash indicates that he laid his shin across the Acklin's legs. *See* Dkt. No. 53-8 at 9.

Applying the Sixth Circuit's three-part test for determining a defendants entitlement to qualified immunity, the Court is hard pressed to conclude that Lash's lying of his shin on Acklin's legs constitutes significant force on a restrained subject. *See Merithew*, 417 F. App'x at 499. Notably, Acklin never indicates Lash used force.  Furthermore, Acklin does not provide

---

*Id.* Concerns about Defendant Dotter contracting the disease while Acklin was restrained behind a protective black barrier in a police vehicle are undermined by the fact that "HIV does not survive long outside the human body (such as on surfaces), and it cannot reproduce." *Id.*

evidence indicating there were serious injuries to his legs. Applying the applicable law to the facts in the light most favorable to the Acklin, the Court does not find that Lash's use of force was objectively unreasonable in light of Acklin's clearly established constitutional rights.

Nevertheless, Lash's failure to intervene and stop the alleged actions of Defendants Melendez and Randazzo presents a different issue. The Sixth Circuit has explained that "a law enforcement officer can be liable under Section 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby denies equal protection to persons legitimately exercising rights guaranteed them under state or federal law." *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982) (quoting *Smith v. Ross* 482 F.2d 33 (6th Cir. 1973) (per curiam)); *see also id.* ("Acts of omission are actionable in this context to the same extent as are acts of commission").

The Sixth Circuit has stated that "[i]n deciding upon a motion for summary judgment, we must view the factual evidence and draw *all reasonable inferences* in favor of the non-moving party." *Nat'l Enters., Inc. v. Smith,* 114 F.3d 561, 563 (6th Cir. 1997). In this case, Acklin explained in his deposition that his beating stopped when he heard a uniformed officer say "that's enough." Dkt. No. 53-2 at 23. Lash stated in his deposition that he followed Randazzo and Melendez to the side door and made entry after Melendez breached the door. *See* Dkt. No. 53-8 at 6-7. Lash indicates that he entered the house and covered the long hallway. *See id.* at 7. Notably, Lash states that he saw Acklin emerge and that he witnessed what he considered to be a struggle between Acklin, Melendez, and Randazzo until Acklin was cuffed. *See id.* at 7-10.

Defendant Czarnecki indicates that he only entered the residence after Acklin was placed into custody. *See* Dkt. No. 53-6 at 9. Defendant Schewe testified that he only secured the door with his K-9 partner and did not see what went on inside the house. *See generally* Dkt. No. 53-9.

-23-

Thus, it appears Lash was the only other officer in the room aside from Melendez and Randazzo during the incident in question.

Acklin testifies that he was beaten before a uniformed officer tapped Melendez on the shoulder saying "that's enough." *See* Dkt. No. 53-2 at 23. Lash indicates that he witnessed the "struggle" between Acklin, Melendez and Randazzo. This counters the Defendants' contention that Lash did not have "a realistic opportunity to intervene and prevent harm." Dkt. No. 51 at 32 (citing *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013)). The Court draws the reasonable inference from the facts recounted by parties, that Lash was the uniformed officer who ended the assault. Viewing all reasonable inferences in the light most favorable to Acklin, the Court concludes Acklin has demonstrated that Lash's alleged inaction was objectively unreasonable in light of Acklin's clearly established constitutional rights.

### iii.    Qualified Immunity Analysis for Defendants Parson, Adams, Czarnecki, and Schewe

With respect to Defendants Parson, Adams, Czarnecki, and Schewe, the Court finds that these Defendants are entitled to qualified immunity. Even when the alleged facts are viewed in a light most favorable to the Plaintiff, the facts do not demonstrate that these Defendants violated the Acklin's clearly established Constitutional rights.

As discussed, Acklin's Fourth Amendment claim for excessive force while handcuffed is "clearly established;" thus, Plaintiff meets that prong of the qualified immunity analysis. *See Merithew*, 417 F. App'x at 499. Nonetheless, there have been no facts alleged that these Defendants used *any* force against Acklin whatsoever. Similarly, Acklin has not alleged sufficient facts to support his contention that these Defendants could be liable for failing to intervene. *See* Dkt. No. 53 at 25 (citing *Bruner v. Dunaway*, 684 F.2d at 426).

Implicit in the Sixth Circuits holding that officers can be held liable for failing to intervene, is the actual "presence of [the] defendants during the assault." *Bruner v. Dunaway*, 684 F.2d at 426; *see also id.* at 425-36 (citing *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972), to note the Seventh Circuit reversed a verdict for the defendants because the "plaintiff testified that he was beaten by unidentified officers in the backroom of a tavern[, but] … was able to identify three officers *who were present* at the time of the beating."); *see also Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997) ("Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.").

The facts indicate that none of these Defendants had any contact with Acklin nor did they visibly observe the alteration where Acklin was injured. Acklin can only recall three officers that were present during his assault: Defendants Melendez, Randazzo, and one uniformed officer. The Court has already drawn a reasonable inference to conclude that the uniformed officer was Defendant Lash.

Plaintiff makes no assertion about Defendant Parson's involvement in the case. The Defendants assert that Parson's sole involvement was sending information to the prosecutor's office and making a warrant request. *See* Dkt. No. 51 at 34. Defendant Adams' deposition testimony indicates that by the time he arrived to the scene, Mr. Acklin was already arrested. *See* Dkt. No. 53-7 at 5. With respect to Defendants Czarnecki and Schewe, the facts, as presented to the Court, indicate that these officers were outside of the house and did not observe the alleged constitutional violation that was occurring. *See* Dkt. No. 53-6 at 9 (Czarnecki testimony); *see generally* Dkt. No. 53-9 (Schewe testimony).

In sum, Acklin has failed to present the Court with sufficient evidence to demonstrate that these particular Defendants violated his clearly established constitutional rights. *See Turner*, 119 F.3d at 429 ("[T]he record is devoid of any suggestion that [the defendant] actually observed or should have known of [the violating defendant's] actions."). Accordingly, the Court concludes that when the facts and all reasonable inferences are viewed in the light most favorable to the Plaintiff; Acklin has not demonstrated that the alleged actions of these Defendants were objectively unreasonable in light of his clearly established constitutional rights.

**b.  Analysis of Fourth Amendment Probable Cause Claims**

The Court finds that all of the Defendant Officers are entitled to qualified immunity with respect to the probable cause supporting the arrest of Acklin. The Defendants assert that the officers are entitled to qualified immunity because the arrest was, in fact, supported by probable cause. *See* Dkt. No. 51 at 3-4. Specifically, the Defendants argue that the facts known to the officers were sufficient to warrant a reasonable man in believing that the Plaintiff had committed or was committing a crime. *See id.* (citing *Hoover v. Walsh*, 682 F.3d 481, 499 (6th Cir. 2012)). Acklin argues that the arrest was unreasonable because he was "subdued and handcuffed for no apparent reason[.]" Dkt. No. 27 at 35.

As Acklin points out, however, "[w]hether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004) (quoting *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)). The Court notes that "[w]hile the facts underlying probable cause . . . must be submitted to a jury, probable cause determinations are legal determinations." *Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005); *see also id.* (citing *Stewart v. Sonneborn,* 98 U.S. 187, 194, 25 L.Ed. 116 (1878), to

note that "[w]hen no material dispute of fact exists, probable cause determinations are legal determinations that should be made by a court.").

Here, the Defendants recall approaching three black males.  Two of the individuals allegedly ran into a house while holding objects in their waistbands. The officers have stated that they recovered heroin from the third individual who did not flee into the house.  After breaching the house, the Defendants stated that they saw two black males who they decided to arrest.

At the time of the arrest, the Court finds that the Defendant Officers possessed probable cause because "the facts and circumstances within the arresting [officers'] knowledge were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." *Hoover*, 682 F.3d at 499 (quoting *Arnold v. Wilder,* 657 F.3d 353, 363 (6th Cir. 2011)); *see also id.* (quoting  *Smith v. Thornburg,* 136 F.3d 1070, 1074 (6th Cir. 1998) to note that the Sixth Circuit has "defined probable cause as 'reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion.'").

Only Defendants Melendez, Randazzo, and Lash could be held liable under this claim, because none of the other Defendants effectuated the arrest.  Nonetheless, the Court does not deem this arrest as constitutionally problematic. *See Hoover* , 682 F.3d at 499 (citing *Hayes,* 470 U.S. at 815–16, 105 S.Ct. 1643, to state "[a]n arrest, of course, is constitutionally problematic only in the absence of probable cause."). As such, the Court will resolve Acklin's Section 1983 claim regarding a lack of probable cause for his arrest on the first prong of the qualified immunity analysis.  The Court finds that the Acklin's Constitutional rights were not violated in the events leading up to the arrest.  Because the Defendants initially acted with requisite justification in their encounter with Acklin, the Court finds that the Acklin's Section 1983 claim regarding lack of probable cause for his arrest does not survive summary judgment.

### 2. Section 1983 Municipal Liability for the City of Inkster

The Court finds there is no municipal liability for the City of Inkster. Acklin has decided not to pursue his claim for the existence of a policy or custom of illegal arrest/detention against the City of Inkster. *See* Dkt. No. 53 at 21. Furthermore, after reviewing the briefing, the Court also finds that the City of Inkster is not liable for failing to supervise or train its officers.

A municipality can only be held liable under Section 1983 "if the plaintiff demonstrates that the injury suffered was a direct result of the city's official policy or custom." *Slusher v. Carson*, 540 F.3d 449, 456-57 (6th Cir. 2008) (citing *Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Cummings v. City of Akron,* 418 F.3d 676, 684–85 (6th Cir. 2005) (citing *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

The Sixth Circuit has indicated that a plaintiff can show that a municipality has an illegal policy or custom by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Here, Acklin alleges that the City of Inkster is liable under Section 1983 for inadequately supervising and training its police officers. *See* Dkt. No. 53 at 29. In order to prevail "'on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually

caused the injury.'" *Marcilis v. Twp. of Redford*, 693 F.3d 589, 605 (6th Cir. 2012) (quoting *Ellis v. Cleveland Mun. Sch. Dist.,* 455 F.3d 690, 700 (6th Cir. 2006)).

### a.   Failure to Supervise Analysis

In support of his position that the City of Inkster failed to properly supervise its police officers, Acklin relies upon an unpublished Ohio district court opinion. *See* Dkt. No. 53 at 29-30 (citing *Kammeyer v. City of Sharonville, Ohio*, No. 1:01-CV-00649, 2006 WL 1133241, at *1 (S.D. Ohio Apr. 27, 2006)). Acklin argues that *Kammeyer* supports his position because Defendants Melendez and Randazzo testified that they had never received a performance evaluation from the City of Inkster. *See* Dkt. No. 53-4 at 4-5 (Melendez testimony); Dkt. No. 53-3 at 4 (Randazzo testimony).

However, as the Sixth Circuit has noted, a showing that a municipality failed to conduct performance evaluations "alone is not enough to show deliberate indifference, especially in the absence of evidence of a pattern of excessive force, a record of officers going unpunished for excessive force, or other circumstances tending to show that [the City of Inkster] was aware or could have been aware that [the Defendants were] prone to unwarranted application of force." *Amerson v. Waterford Twp.*, 562 F. App'x 484, 492 (6th Cir. 2014).

Without more, the Court finds that *Kammeyer,* upon which Acklin relies, is distinguishable from the facts of this case. *See Fedie v. Livingston Cnty.*, No. CIV. 09-10417, 2010 WL 2287310, at *7 (E.D. Mich. June 4, 2010) (finding that the plaintiff in that case "failed to show that, based on the experiences of two officers over an unspecified period of time, the County has a policy of failing to supervise its employees" and highlighting the fact that the plaintiff offered "no evidence supporting the proposition that the County was put on notice of [the Defendant's] alleged propensity to use excessive force and failed to respond accordingly.").

As a result, the Court finds that Plaintiff has failed to show deliberate indifference with respect to failing to supervise police officers on behalf of the City of Inkster. *See Amerson*, 562 F. App'x at 492; *Fedie*, 2010 WL 2287310, at *7; *Marcilis*, 693 F.3d at 605.

### b.  Failure to Train Analysis

Acklin also argues that "it is patently obvious that Defendant City of Inkster has routinely failed to properly train its officers as to the proper use of force." Dkt. No. 53 at 30.  In support of his position, Acklin cites testimony from Defendant Randazzo who testified that the City of Inkster stopped conducting use of force training in 2007 or 2008. *Id.* (citing Dkt. No. 53-3 at 4). Acklin buttresses his position with deposition testimony from Defendant Czarnecki who had difficulty recalling how many times he had use of force training while he worked for the City of Inkster, and Defendant Adams who described the training as "sporadic" *Id.* at 30-31 (citing Dkt. No. 53-6 at 4-5 (Czarnecki Testimony) and Dkt. No. 53-7 at 4 (Adams Testimony)).

The Defendants note that Defendants Melendez and Schewe testified they received use of force training every year. *See* Dkt. No. 54 at 7 (citing Dkt. No. 53-4 at 4-5 (Melendez testimony) and Dkt. No. 53-9 at 4 (Schewe testimony)).   Additionally, the Defendants note that Defendant Dotter testified that, apart from structured training, there was in-service training with officers on his shift. *See id.* (citing Dkt. No. 53-5 at 4).

As previously discussed, in order to prevail on a failure to train or supervise claim, Acklin must prove three elements. *Marcilis*, 693 F.3d at 605.  One of those elements requires Acklin to prove that any inadequacy of training "was the result of the municipality's deliberate indifference." *Id.* As to the this element, Acklin has not proffered evidence that the City of Inkster's training program was so inadequate as to amount to deliberate indifference.

One way Acklin could establish deliberate indifference is by showing "prior instances of unconstitutional conduct demonstrating that the [municipality] ha[d] ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Burgess*, 735 F.3d at 478 (citations omitted) (brackets in original) (internal quotation marks omitted); *see also Connick v. Thompson*, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011) ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train.").

Acklin makes no such showing here. The record is devoid of substantiated evidence of prior misuses of force that could be deemed to have put the City of Inkster on notice of any deficiency in training.[2]   In his motion, Acklin does not even allege that the City of Inkster ignored a history of excessive force. Thus, Acklin has not established deliberate indifference by showing prior instances of unconstitutional conduct.

Deliberate indifference can be also based on a single violation of rights.  However, the Sixth Circuit has noted that in order "[f]or liability to attach in the instance of a single violation, the record must show a *complete failure to train the police force*, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 567 (6th Cir. 2011) (internal citations omitted) (emphasis added).

This District has noted that "deliberate indifference sufficient to establish municipal liability rarely can be found on the basis of a single incident." *Hublick v. Cnty. of Otsego*, No. 12-CV-14146, 2014 WL 495403, at *11 (E.D. Mich. Feb. 6, 2014) (citing *Connick v. Thompson*, 131 S. Ct. at 1358).  This case is not one of those rare instances.

---

[2] Though not addressed in Acklin's Motion, the Defendants correctly note that any of the Defendants' deposition references to previous lawsuits for use of force would be inadmissible, and are insufficient to show individual or municipal liability. *See* Dkt. No. 54 at 6 n.1.

Acklin relies heavily on Defendant Randazzo's testimony that the City of Inkster stopped conducting use of force training in 2007 or 2008. However, Defendants Czarnecki, Melendez, Adams, Schewe and Dotter all indicate that there was *some* training. *See* Dkt. No. 53-6 at 4-5 (Czarnecki Testimony); Dkt. No. 53-7 at 4 (Adams Testimony); Dkt. No. 53-4 at 4-5 (Melendez testimony) Dkt. No. 53-9 at 4 (Schewe testimony); Dkt. No. 53-5 at 4 (Dotter testimony).

This being the case, the Court finds that Acklin has "supplied too little Rule 56 evidence to create a genuine issue of material fact" regarding his theory of municipal liability. *See Peet v. City of Detroit*, 502 F.3d 557, 567 (6th Cir. 2007) (finding that the plaintiff presented "insufficient Rule 56 evidence to create a trial-worthy dispute over whether Detroit has a custom of tolerating federal rights violations."); *see also id* at 568 (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005), to state: "A custom or policy must be shown by 'a clear and persistent pattern,' and . . . as this court held in *Thomas* [] no reasonable juror could 'infer a municipal-wide policy based solely on one instance of potential misconduct[.]'").

The Court will not draw inferences of inadequate supervision, inadequate training, deliberate indifference, and causal effect on the part of the City of Inkster based on the alleged use of force by Defendants Melendez and Randazzo.  The Court finds that the City of Inkster did not "completely fail to train" its officers regarding use of force. Because Acklin has not put forth sufficient evidence to support reasonable jury findings that the City of Inkster's training program was inadequate—or that the City of Inkster was deliberately indifferent to the inadequacy—the City of Inkster is entitled to summary judgment on Acklin's failure to supervise and train claim.

### 3.  Liability for the Defendants Pursuant to Michigan Law.

Lastly, the Court will discuss the liability of the Defendants under Michigan law.  As discussed, Defendants Schewe, Czarnecki, Adams, and Parson are not liable under Section 1983

under the theories of excessive force, failing to intervene, and effectuating an arrest without probable cause. As such, the Court also finds that these officers are not liable under state law. The analysis for Defendants Melendez, Randazzo, Dotter, and Lash is discussed below.

### a. Assault and Battery

Judge Robert Bell in the United States District Court for Western District of Michigan has noted: A "[p]laintiff's assault and battery claim is analogous to [their] § 1983 excessive force claim, in that [they] can only recover if [the defendant's] conduct was objectively unreasonable." *Bell v. Porter*, 739 F. Supp. 2d 1005, 1015 (W.D. Mich. 2010) (citing *VanVorous v. Burmeister*, 262 Mich. App. 467, 482, 687 N.W.2d 132, 142 (2004), to note that under Michigan law, an assault and battery claim against a police officer requires proof that the officer's actions "were not justified because they were not objectively reasonable under the circumstances").

The Court has already found that the actions of Defendants Melendez, Randazzo, and Dotter were objectively unreasonable under the circumstances. For Defendant lash, however, the Court found that the force used by *was* objectively reasonable. Given these findings, the Court finds that the same issues of fact identified with respect to Acklin's excessive force claim preclude entry of summary judgment on his assault and battery claim with respect to Melendez, Randazzo and Dotter. Lash, however, is entitled to summary judgment on these claims.

With respect to governmental immunity under Michigan law, the Court also finds that Melendez, Randazzo, and Dotter are not entitled to summary judgment. In order for Melendez, Randazzo, and Dotter to be entitled to governmental immunity for an intentional tort, they must establish that they were "acting in the course of [their] employment and at least reasonably believed that [they] w[ere] acting within the scope of [their] authority, that [their] actions were discretionary in nature, and that [they] acted in good faith." *Miller v. Sanilac Cnty.*, 606 F.3d

240, 254 (6th Cir. 2010) (citing *Odom v. Wayne County,* 482 Mich. 459, 760 N.W.2d 217, 228 (2008), which defined good faith as "without malice.").

The Sixth Circuit has distinguished federal qualified immunity from governmental immunity in Michigan, by noting Michigan's immunity is "'subjective in nature': It 'protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent.'" *Smith v. Stoneburner*, 716 F.3d 926, 934 (6th Cir. 2013). Applying this standard, and viewing the evidence in the light most favorable to the Plaintiff, the Court is satisfied that there is a dispute of fact.  At this stage in the litigation, a reasonable jury could conclude that Melendez, Randazzo, and Dotter acted in bad faith. Accordingly, the motion for summary judgment on the assault and battery claim will be denied as to Defendants Melendez, Randazzo, and Dotter.

### b.  Gross Negligence

The Sixth Circuit has acknowledged that "Government employees can [] be held liable for gross negligence under Michigan tort law." *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 641 (6th Cir. 2013) (citing Mich. Comp. Laws § 691.1407(2)(c)). Defendants seem to imply that Acklin's Gross Negligence claim is subsumed into his assault and battery claim; but Acklin contends that his allegation of gross negligence is independent and distinct from his allegations of excessive force because it is premised on the failure to intervene. *See* Dkt. No. 53 at 33.

The Court has previously found that, drawing all reasonable inferences in favor of the Plaintiff, Defendant Lash could be held liable under a failure to intervene theory.  With respect to the claim for gross negligence, the Court agrees that this claim is distinct. The Sixth Circuit has acknowledged "a cause of action for gross negligence under Michigan law where an officer fails to intervene on behalf of an arrestee being subjected to excessive force." *Wells*, 538 F. App'x at

642 (citing *Philpott v. City of Portage,* No. 4:05–CV–70, 2006 WL 2385316, at *7 (W.D. Mich. Aug. 17, 2006)).

The Sixth Circuit emphasized that in *Philpott,* the Court found officers could be held liable on a theory of gross negligence because the "officers ignored *ongoing conduct* that they had the opportunity to prevent." *Id.* (citing *Philpott* , 2006 WL 2385316, at *7, and noting that the *Philpott* holding was premised on the idea that the "officer 'could have prevented [the arrestee's] injuries by adjusting or removing the handcuffs' that were applied too tightly."). Given the nature of the force allegedly applied in the instant case by Defendants Melendez and Randazzo, and drawing all reasonable inferences in favor of the Plaintiff, the Court finds that Lash's purported inaction could constitute gross negligence under Michigan law.

### c.   False Arrest/False Imprisonment

Lastly, summary judgment will be granted regarding Acklin's state law claims for false arrest/false imprisonment.  In order to make out a claim of false arrest, Acklin must demonstrate that the Defendants "participated in an illegal and unjustified arrest, and that [the defendants] lacked probable cause to do so." *Bletz v. Gribble,* 641 F.3d 743, 756 (6th Cir. 2011) (quoting *Walsh v. Taylor*, 263 Mich. App. 618, 626; 689 N.W.2d 506 (2004)).  The Court has already determined that the officers had probable cause to arrest Acklin.  As such, the Defendants are entitled to summary judgment on this state law claim.

### IV. CONCLUSION

For the reasons discussed, the Court **GRANTS** Defendants' Motion for Summary Judgment with respect to all claims against the Defendants City of Inkster, Parson, Adams, Czarnecki, and Schewe.

The Court **GRANTS** Defendants' Motion for Summary Judgment for all Defendants with respect the federal claims for arrest without probable cause under Section 1983, and the state claims under Michigan law for false arrest/false imprisonment.

The Court also **GRANTS** Defendants' Motion for Summary Judgment for Defendant Lash with respect to the state claim for assault and battery under Michigan law.

However, the Court **DENIES** Defendants' Motion for Summary Judgment for Defendants Melendez, Randazzo, Lash, and Dotter with respect to federal claims for excessive force under Section 1983.

The Court also **DENIES** Defendants' Motion for Summary Judgment as it pertains to Defendants Melendez, Randazzo, and Dotter with respect to the state claims for assault and battery under Michigan law.

Lastly, the Court **DENIES** Defendants' Motion for Summary Judgment for Defendant Lash with respect to the state claim for gross negligence under Michigan law.

SO ORDERED.

Dated: March 20, 2015

/s/Gershwin A Drain
Hon. Gershwin A. Drain
United States District Court Judge